## Seitzinger *against* Ridgway.

K & S were joint contractors for the purchase of lands called "Lee's lands," to hold as tenants in common, and by agreement the seller was to convey to K to hold an undivided moiety for himself, and the other moiety for S. S agreed with R that he should have one-third of the nett proceeds or profits of the said lands (describing them as lying on and about the Mine Hill in Schuylkill county, containing about 1400 acres) in consideration of his services in their sale. About three months afterwards, by another agreement between K & R, K bound himself to convey to R, his heirs and assigns, the one-sixth part of a certain tract of land, situate on the waters of Mill Creek, in Schuylkill county, adjoining lands of Francis B. Nichols, Kettle & Wagner, Potts & Bannan, and others, containing by estimation 1200 acres, being the same tracts of land which were known by the name of Lee's lands, to be conveyed to said R when the title to said land shall be arranged and settled agreeably to the understanding and agreement made with S, and also to account with said R for one-third of the nett profits of sale of one moiety already made to S W. The original agreement with S was in the possession of R when the last agreement was made, and not produced or shown to K; and there were older claims to the land by third persons not settled or arranged.

*Held*, 1. That the last agreement was executory even if it embraced lands.

2. That in the absence of evidence to show any other agreement in writing than the two above-mentioned, the latter agreement must be taken as referring to the former, so as to make the former a part of it, and bound K only to the extent of the former agreement with S; and that R had no right to the lands themselves so as to be able to maintain partition or ejectment, but only an interest in the proceeds after sales made.

3. It appearing that Lee had been the owner of three contiguous tracts at or near the neighbourhood of the above description, containing 1200 acres 85 perches, that K & S had agreed with him for those tracts before the first agreement, and that he had conveyed them to K just before the last agreement, and that they were the only lands K & S had any right to when they agreed with R, all evidence that any other lands were meant was irrelevant and inadmissible.

In a suit in partition, a judgment creditor of the plaintiff who swears that he has a slim chance of getting the amount of his judgment, unless the plaintiff can establish his right to the lands in suit, is incompetent to be a witness for the plaintiff.

Parol evidence to vary a written agreement concerning lands, or to pass an interest in them in fee-simple without writing, is inadmissible.

ERROR to the Common Pleas of *Schuylkill* county.

This was an action of partition brought by Thomas S. Ridgway, the defendant in error, against Jacob W. Seitzinger, George D. B. Keim, Charles Wetherill, Samuel P. Wetherill, John P. Wetherill, William Wetherill, and Rebecca Gumbes. The deaths of two of the defendants were afterwards suggested, and others substituted. The plaintiff claimed one-sixth part of 1750 acres of land, situate in Norwegian and Schuylkill townships, Schuylkill county, bounded by surveys in the name of Theophilus Hughes, Kettle & Wag-

ner, John Stanly, the survey on which the town of St. Clair is located, John Wolf, Daniel Jones, Mary Davis, and others. The defendants pleaded *non tenent insimul.*

The plaintiff's claim was founded on the following agreements:

*" Orwigsburg, August* 16, 1827.

"Whereas, George Keim and Jacob W. Seitzinger, both of Reading, Berks county, hath purchased a tract or tracts of coal land, lying on and about the Mine Hill, in Schuylkill county, containing about 1400 acres. Now the true intent of this article is to satisfy all whom it may concern, that Thomas S. Ridgway is to have one-third of the nett proceeds of the aforesaid lands; that is to say, one-third of profits, after deducting costs and interest upon said one-third, in consideration of his services in sale of said lands.

" Jacob W. Seitzinger."

"For a valuable consideration which I acknowledge to have received, I hereby bind myself, my heirs and assigns, to convey or cause to be conveyed, by proper conveyance, to Thomas S. Ridgway, of the borough of Orwigsburg, or to his heirs and assigns, or to whom the said Thomas or his heirs may appoint, the undivided third part of a moiety, being one-sixth part of the whole of a certain tract of land situate on the waters of Mill Creek, in Schuylkill county, adjoining land of Francis B. Nichols, Esq., Kettle & Wagner, Potts & Bannan, and others, containing by estimation 1200 acres; being the same tracts of land which are known by the name of Lee's lands; to be conveyed to said Ridgway when the title to said land shall be arranged and settled, *agreeably to the understanding and agreement made with Jacob W. Seitzinger.* I further, for the consideration aforesaid, bind myself to account with the said Thomas S. Ridgway for one-third part of the nett profits or proceeds of the sale of one moiety of said lands to Samuel Wetherill, after deducting the whole of the purchase money paid for said land, and the expenses, &c. in making the sale, and completing the title to said property. In witness whereof, I have hereunto set my hand and seal, this 19th day of December 1827.

" George D. B. Keim." [seal.]

The plaintiff gave in evidence a deed from Mordecai Lee to G. D. B. Keim, dated 15th of November 1827, the consideration of which was $2400, for three tracts of land on three warrants of 400 acres each, the whole of which was 1200 acres 85 perches. They were stated to be surveyed, one in the name of George Henninger, on the 19th of November 1793, and the other two in the names of Susannah Sillyman and Henry Thiehl on the 19th of August 1794; also a deed from G. D. B. Keim to Samuel Wetherill, dated 16th of July 1828, for the undivided half of the tract described in the former deed, for the consideration of $10,500. The plaintiff

also gave in evidence agreements and deeds between various persons and John Bannan, Esq, for lands lying south of that described in the deed from Lee to Keim, which he alleged to be the lands known as Lee's lands, and embraced within the agreements of 16th of August and 19th of December 1827, and a portion of which he sought to recover in this action.    They were as follows:

Article of agreement, 20th of April 1827, A. & G. Ebert with John Bannan, and deed, 18th of December 1827.  Article of agreement between David Shappel & John Bannan, 21st of June 1827. Article of agreement between Daniel Shappel & John Bannan, 26th of September 1827, and deed 17th of December 1827; and further, two deeds from John Bannan to G. D. B. Keim & Samuel Wetherill, dated 19th of December 1827.  Deed, George Shoemaker to same, 1st and 19th of January 1828.  Deed, Solomon Repp to same, 12th of January 1828.  Deed, Phineas Freeman to same, 30th of January 1828.  Deed, Commissioners of Schuylkill county to same, 26th of May 1828, for 1200 acres, sold as the property of M. Lee for $150.  The defendants objected to the admission of all these deeds and agreements, except those of 16th of August and 19th of December 1827; but the court admitted them, and the defendants excepted.

The plaintiff then offered to prove by a witness (Lauderbrun) that Keim & Seitzinger had the Lee warrants located on the ground by the witness, in such a manner as to cover the new warrants, which Ridgway afterwards purchased for them at their request; in order to show that Keim & Seitzinger had an object in employing the services of Ridgway to purchase in the new titles, to perfect their title to the land, and to show the consideration in the article of agreement.  The defendants objected to this evidence, on the ground that the papers showed that Ridgway did not purchase the title, but that the deeds were made to Keim & Wetherill.  The court admitted the evidence, and the defendants excepted.

The witness then testified that some 13 or 16 years before, at the instance of Keim & Seitzinger, he went to locate their surveys.  Seitzinger forbade his locating them on Lee's lands surveyed in the names of Sillyman, Thiehl & Henninger, and he located them south of these.  The Lee warrants interfered with some of the new warrants, and these with others, and it was difficult to locate them.  Seitzinger called the body of lands Lee's lands.

The plaintiff then offered to prove by John Bannan, Esq., that he conveyed the land mentioned in the deeds, from him already in evidence, to Keim & Wetherill, at the request of Ridgway, and that Keim acknowledged at the time of receiving those conveyances, that he held one-sixth of the whole land, the one-third of one-half in trust for Ridgway; that Keim repeatedly told the witness that Wetherill had agreed to take surplus outside of the old surveys on the purchase from Lee, at the same rate that he paid

for the 1200 acres; that Seitzinger said on one occasion in the presence of Keim, that Ridgway was not to have any of the land, but only the one-third of the money after the land was sold; that Keim immediately denied that, and said that he was to have the one-third of the land which they retained.    That Seitzinger then said Ridgway was not to have any of the surveys outside of the old surveys purchased of Lee; that Keim denied that, and said that Ridgway was to have the one-third of the excess of land outside of the old surveys, which they acquired by purchasing in the new warrants.    That Keim & Seitzinger repeatedly told him the land surveyed on the old warrants covered all the land embraced by the new warrants.    That they always designated the land covered by the old and new warrants as the Lee lands.    That Seitzinger said his title under the old warrants was good enough, and he did not regard the new ones, but that the purchases were made by Keim, through Ridgway, for the purpose of quieting and settling the title.    That the witness was directed by Keim to make the deed to Wetherill with him, as he did.    And that the whole consideration in the deed for $855 was paid to him by Wetherill's check.    That previous to his conveyance, both Seitzinger & Keim told the witness that Lauderbrun had located the Lee warrants on his new surveys.    That some time after those deeds, they told him they knew that location was erroneous.    That when witness purchased these lands, he had no knowledge that Ridgway was concerned with Keim & Seitzinger.    That witness is the son-in-law of Ridgway, and would not have made the conveyance, but at his solicitation, and because they said Ridgway was interested with them in the land.    This was offered to prove what was the understanding between Seitzinger and Ridgway, and referred to the conveyance of Keim; and also to show what land was designated as the Lee lands in the written agreements, and also the consideration of Bannan, and the consideration for giving Ridgway the one-third of the land.    The defendants objected to this evidence, but the court admitted it, and the defendants excepted.

The witness then testified :

"I never heard the body of land in question designated by any other name than the Lee lands.    I have no recollection of hearing Keim or Seitzinger call them at any particular time the Lee lands, but in all my communications with them, they have been so designated.    The object which Seitzinger & Keim had in purchasing the new warrants, was to perfect their title to Samuel Wetherill. I heard Keim & Seitzinger say that Wetherill had agreed to take the one-half of the Lee lands properly so called, together with one-half of all such tracts as they might purchase for the purpose of perfecting the title.    It was supposed in the purchase, that some of the tracts would extend beyond the Lee warrants.    Keim urged that as a reason for the purchases; he said it would be an advantage to him, Keim, Seitzinger & Ridgway.    At the time he made

[Seitzinger v. Ridgway.]

these purchases, Keim said Seitzinger was opposed to it, and disposed to battle it out, but he thought it best to purchase, and then they would quiet the title, and get the excess of land. After these purchases it was all designated as the Lee land. Seitzinger was generally opposed to buying out the interfering claims. He said the title of Lee covered those new warrants, and Lee's title was a good one. It was allowed by them that the Lee title covered the Freeman, the Ebert, Shaffer and part of the warrant which Shoemaker claimed as a part of the Shaffer tract, which belonged to the Repps. I had purchased from Shaffer and Ebert; at the time I did so I had heard of a claim set up to these lands by Seitzinger & Keim. When I purchased I knew nothing about Ridgway interfering in the matter. This rested in that way, and I was about having a survey of those lands, to investigate the matter, and see whether the claims of Keim & Seitzinger were good or not. Sometime during that year, I was informed by Ridgway that he was interested with Keim & Seitzinger, and that they were desirous of purchasing out these conflicting claims. I told him if such was the fact I would not interfere with him, and that I would sell them such titles as I had acquired at cost. After I agreed to this, at the instance of Ridgway, I had frequent communications with Keim & Seitzinger, and I wanted it distinctly understood that Ridgway should be equally interested with them in the land, before I would make any contract about it. Keim & Seitzinger came here. I went to them and stated that I understood that such was the arrangement between Ridgway and themselves. They both said that was the understanding, and the agreement they had with Ridgway. I told them that my object in calling was to ascertain if that was the agreement; and unless it was, I would not convey to them those interfering claims. And in pursuance of that, I proceeded to make the final arrangement with Ebert and Shappel. Ebert consented to convey absolutely, on my giving them the house and lot I valued at $600, and Shappel consented to take the $500. Keim agreed to furnish the money, to pay to Shappel the $250. It was not furnished by the time stipulated, but was finally paid to me by Samuel Wetherill.

I made the agreement between Keim and Ridgway. That agreement was formed upon what I understood to be the agreement between the parties, when I conversed with Keim & Seitzinger upon the subject. It was executed by Keim in my office, in the presence of Ridgway. Wetherill and Seitzinger were in the county at the time of its execution. The agreement was prepared without that interlineation in it by me. It was read over by myself and Keim, and Keim suggested the propriety of having a reference in the agreement to Seitzinger. I inquired of Keim if that agreement did not contain the true agreement with Seitzinger, himself and Ridgway. He said that it did, but he wanted a reference to the agreement of Seitzinger. He did not want it to appear that

[Seitzinger v. Ridgway.]

he made the agreement alone, without Seitzinger. I referred to Mr Ridgway, and he said there was no objection to putting that in, and I put it in. At the time this agreement was executed, it was agreed by Seitzinger, Keim & Ridgway that they would sell but the one-half of the land. This was not at its execution, but prior to that, it had been so agreed; and when it was drawn up, I was instructed to draw it in such a way that one-sixth of the land was to be conveyed by Keim to Ridgway. The reason why the obligation was taken from Keim, without reference to Seitzinger, was, it had been previously agreed that all the conveyances should be made to Keim; he was to have the legal title. He was to receive all the money from Wetherill, and pay over to Seitzinger and Ridgway. The written agreement between Seitzinger and Ridgway was not present. There was no reference made to it in any way at the time. Those deeds from me to Keim were not delivered till Keim executed this agreement. They were withheld till Keim reduced to writing what I understood to be the agreement. I would never have executed those conveyances without having an understanding with Keim, but would have done it without its being reduced to writing. I would not have conveyed to Keim for the consideration I did, without Ridgway was to have the one-third. I was paid by S. Wetherill's check. After they disputed about the matter, I had very little communication about it. I once met them in Reading, in Keim's office. I went there to apprise them of another claim set up to another part of the land. I told them all I knew about it. They were desirous that I should procure a settlement of those matters; I told them I had no objection, but before I would act they must do justice to Ridgway; Keim said that was right. Seitzinger said he cared nothing about it; that he had thrown the Lee lands out of his book long ago. Keim said if he had he ought not to prevent his friends from making something out of them. I called upon Keim with conveyances drawn for him to execute, according to this agreement—that was in his house in Reading. That was shortly after Keim refused to comply with the agreements, shortly after Biddle's letter. Keim refused to execute them. He said it was the fault of Seitzinger. He said the matter ought to be settled.

I was examined in the above action of covenant against Keim on the part of the plaintiff. I do not know who had the possession of the agreement between Seitzinger and Ridgway, except Ridgway produced it. It was in Ridgway's handwriting. I cannot recollect, but have no doubt I saw it shortly after Biddle's letter. I cannot say that the deeds were before or after the action of covenant, but presume before. I saw the letter of Biddle shortly after it was received. I have not the slightest recollection of Keim asking for the agreement between Ridgway and Seitzinger in my office. I do not recollect that at the time of my examination in the covenant case, I said I saw the agreement, and

said it was called for. Ridgway then lived in Orwigsburg. Seitzinger and Wetherill were at Kepner's at the time Keim executed the agreement in my office. They were not called in. I kept the agreement Keim signed. I never showed the agreement to Seitzinger or Wetherill; was never asked to. After the agreement was signed, Ridgway and myself went round to see Wetherill and Seitzinger, at Kepner's. I have judgments against Ridgway; they amount to $2500 or $2600, without the interest. Ridgway has an interest in a tract of coal land on the Swatara. The house in which he resides at Pottsville, there is a mortgage on that for $2000. If Ridgway cannot establish his claim to the Lee lands, I think there is a slim chance of my getting my judgment. I never received anything from Keim on this business. I carried into effect the agreement with Shappel and Ebert before Keim and Wetherill came up. The money was paid to me at that time by Wetherill; the property cost me less than $50—rented it for $50 per year. I engaged to take it back and pay him the $600.

Keim & Seitzinger always represented to me that they had located the Lee warrants on the land I sold. I know no other reason why Wetherill and Seitzinger were not called in, only that they did not wish Wetherill to know then of their transaction."

The court were asked by the defendants to reject this evidence, on the ground that the witness was interested, and that the testimony was irrelevant; but they refused to withdraw the evidence, and the defendants excepted.

The plaintiff also proved by a witness that he had possession of the premises claimed in this suit; that he took out 40 tons of coal in the summer of 1832 on the Ebert tract, and afterwards started a tunnel. Afterwards, the witness went into possession of the mine under the plaintiff's permission, and got a lease from the Wetherills, except Samuel P. Wetherill, who offered to sign a separate lease. Seitzinger declined signing it. In the lease to witness there was a clause allowing him to work " east 500 feet, and westward so far as not to interfere with a drift or tunnel about to be put into said vein by Ridgway."

The plaintiff read in evidence various letters between the parties, which were objected to, but admitted, and exception taken by the defendants.

The defendants contended that the plaintiff had never been in possession, and if he had, he had been ousted. They gave evidence to show that in and after the year 1829, Keim, Seitzinger and Wetherill opened large veins of coal on the land, leased it, paid taxes and employed agents to superintend for them.

It also appeared that to December term 1829, Ridgway brought an action of covenant against Keim, on the article of the 19th of December 1827. Keim claimed a set-off, and a verdict was rendered for him on the 26th of January 1832, for $268.43, which he waived, and judgment was entered in his favour.

It also appeared that Keim & Seitzinger, prior to the deed from Lee, had a contract for the tracts embraced by the deed, and that they were the only lands they had any right to when the respective agreements with the plaintiff were made. These lands they were to hold as tenants in common, but the title was to be made to Keim, who was to hold one moiety for himself and the other for Seitzinger.

The defendants requested the instruction of the court on several points, which were not brought up on the paper-book.

The court (Parsons, President,) charged the jury as follows:

"This is an action of partition, brought to recover one undivided sixth part of 1700 acres of land, situate in Schuylkill county, which one-sixth part, the plaintiff alleges he holds as a tenant in common with the defendants. Had the plaintiff resorted to an action of ejectment instead of an action of partition, one of the disputed questions which now arise, and must be decided by the jury, would not have arisen. But it is the business of a court and jury to decide the whole cause, and the rights of the parties, in whatever form they choose to present them for our consideration. To enable the plaintiff to recover in the action, he must satisfy the court and jury that he is a tenant in common with the defendants, or at least with one of them, of the land mentioned and described in his declaration, or some portion of it. If it is fully established that there is a tenancy in common between the parties, then there is such a legal seisin to the land in the plaintiff that constitutes a legal possession, if any of the co-tenants are in possession, as would cast the burthen of proof upon the defendants to show that he had been ousted from his actual and legal possession. Although much parol evidence was admitted by the court during the progress of the cause, which we thought might cast some light upon the transactions of the parties and their respective claims, yet in deciding the controversy, we think, from a sense of justice to the parties, it is the duty of the court in deciding one branch of the cause, to withdraw most of it from the consideration of the jury, and place the legal title of the plaintiff on a question of law arising from a construction of the written evidence, which the court will give to it, and leave but one question of fact to the jury, as to the right of recovery. This will enable either party, hereafter, to review our opinion before a higher court, with the whole cause presented before that tribunal, and relieve you from much perplexity, and many embarrassments in deciding certain questions of fact, which perhaps throw but little light upon the legal rights of the parties. In giving our opinion upon the law, we are not clear of difficulty; nor is the mind free from great perplexity, in forming what we deem a correct conclusion, upon the written instruments presented before us; but we shall give that opinion, which, upon reflection, we at present are convinced was the contract of the parties, and must be the law of the case.

[Seitzinger v. Ridgway.]

We therefore instruct you, that the contract of the 16th of August 1827 would not vest any title in Ridgway, but only the nett profits of sale. We are asked to say that this agreement, and the agreement dated the 19th of December 1827, taken together, form but one agreement and one contract. This we cannot do, but direct you that by the agreement of the 19th of December 1827, Keim covenanted to convey to Ridgway the undivided sixth part of the land mentioned in that agreement for a valuable consideration, which he acknowledged to have received. By a fair construction of this contract, we think that Keim had received the full consideration money for the land, and for that he engaged to convey to Ridgway that portion of the land, and to his heirs or assigns, or to whom he or his heirs should appoint, and by virtue of it the plaintiff has an equitable interest in the one-sixth part of the land mentioned in said contract. It must also be borne in mind that the legal title was in Keim of the land of which Ridgway was to have a part. It is contended by the plaintiff that there is a reference to the article of the 16th of August 1827, and that the provisions of the article with Seitzinger must control this; but we cannot so understand this agreement with Keim. After going on and acknowledging the consideration, agreeing to convey to the plaintiff and his heirs, and then describing the land, and what is to be conveyed, this sentence ends. A new one is begun, and is in these words: "To be conveyed to said Ridgway when the title to said land shall be arranged and settled agreeably to the understanding and agreement made with Jacob W. Seitzinger." No reference is made to an agreement in writing, or to the one of the 16th of August as distinct from any other, and whether it was a contract by parol or in writing does not appear, and it refers to an understanding as well as agreement. What I understand by this sentence is, that it refers to the time when Keim is to convey, and that is when the title is arranged and settled according to the understanding and agreement with Seitzinger. It does not refer to what interest shall be conveyed, but only as to an arrangement of titles, and the period when Ridgway is to receive conveyances. With this view of the agreement between the parties, the court feel compelled to instruct you that the plaintiff has shown such an equitable title as will enable him to sustain an action of partition, unless there are other facts and circumstances in the cause that would bar his recovery.

There have been certain points submitted to the court by the defendants. As to the first point, the court have in their general charge above and before we received them as reduced to writing, fully given their opinion on that point, and given their reasons, and therefore refuse to give the instruction prayed for, and answer it in the negative, with this further direction; if the jury believe the land was wild and unoccupied, and not in the actual possession and occupied when that agreement of the 19th of December 1827,

[Seitzinger v. Ridgway.]

was made with Keim, it would put the plaintiff in the constructive possession of the land mentioned in it.

The law is correctly stated in the 2d and 3d points, and we answer them in the affirmative. We cannot give the instruction asked in the 4th point; but instruct you that to enable the plaintiff to maintain an action of partition, there must be a unity of possession; whether there is such a unity of possession is a matter of fact for the jury, and whether there has been an actual ouster of the plaintiff by the defendants, is a matter of fact for the jury. The law is this; the possession of one tenant in common is the possession of both, and the taking of the whole profits by one does not amount to an ouster of his companions. But if one actually ousts the other, or affords by his acts sufficient ground for the jury to presume an ouster, the one that is ousted will be driven to an action of ejectment. Whether Ridgway has been ousted or not, you must determine from the evidence. In deciding this question, you will consider the whole evidence in the cause that has even the most remote bearing upon the subject. If you should be convinced that after the 19th of December 1827, when this agreement was entered into by Keim, Ridgway was dispossessed, and the defendant had the actual possession and held it adversely to Ridgway and kept him out of possession, and that he was dispossessed when this suit was brought, then this action cannot be sustained, and the plaintiff must resort to his ejectment. In deciding this question, the jury may call to their attention the fact, that as early as 1829, Keim, Seitzinger and Wetherill opened large coal veins on the land, and leased it, paid the taxes, received all the rents and profits. Also the fact, that Keim refused to convey when called upon, and denied that Ridgway was to have any interest in the land; you will consider the fact that these lands are valuable, that Ridgway lived near them, and saw the defendants taking the profits, and brought no action for the rents, and also every other fact which goes to show that the defendants denied Ridgway's right to possession, and his acquiescence in it. You may also consider the fact proved by S. B. Fisher, that Ridgway went on in 1832, and opened a drift for coal, and rented to the witness and plaintiff's son; that they worked it in 1834. That during the same period Ridgway worked another drift on the same tract. Now, if all this was done with the knowledge of the defendants, it is a strong circumstance to show that he was in possession, and that he was not ousted. You will bear in mind that the witness said Ridgway took out 40 tons of coal. You may also consider the facts mentioned in the lease from Wetherills to Fisher, they were so circumscribed in their mining, as not to interfere with a drift about to be put in by Thomas S. Ridgway. This would be evidence to show that some of the defendants knew of his possession and his mining. Did Ridgway after this ever abandon his possession? Was he ever disturbed in his possession? Did the defendant ever

bring an action of trespass for these acts? Was he ever ousted after this notorious assertion of claim, before suit was brought? If he was not, then he is entitled to your verdict for the one-sixth part of the land mentioned in the agreement of the 19th of December 1827, with Ridgway and Keim.

The court decline giving the instruction asked for in the 5th point. The bringing of the action of covenant in 1829, against Keim, would not bar the present action; but if the jury should believe that all the facts stated in this point exist, and are found to the satisfaction of the jury, then there would be a bar to the plaintiff's right of recovery. Should the jury find a verdict for the plaintiff, they must decide what land mentioned in the plaintiff's declaration partition is to be made of. From the face of the agreement of 19th of December 1827, the land is described as a certain tract of land, situated on the waters of Mill Creek, in Schuylkill county, adjoining lands of Francis B. Nichols, Esq., Kettle & Wagner, Pott & Bannan, and others, containing by estimation 1200 acres, being the tracts of land which are known by the name of " Lee's lands." Of all the lands mentioned in that description then, you can give the one-sixth part, whether it contains more than 1200 acres or less. It is in evidence that all the lands are situate in this position, and mentioned in the same; you may consider the whole contract that part which was called the " Lee lands." The plaintiff can only recover the one-sixth part of the land mentioned in said contract; you must decide from the evidence how much that is. Should you find for the plaintiff, you will say of what land you find the sixth part. If you believe that the plaintiff has been ousted, he is not entitled to recover, and your verdict should be a general one for the defendants."

The defendants excepted to the charge.

After the jury had been out all night, and returned in the morning, and asked for further instruction, the defendants requested the court to charge the jury, that they could not, in case they found for the plaintiff, give any portion of the land which was purchased after the agreement of 19th of December 1827. By the consent of the plaintiff, the court instructed the jury: " The article of the 19th of December 1827 cannot be extended so as to embrace any land except what was owned by the defendants at the time of its date, and mentioned in the same, and embraced in the description as set forth in the article, connected with the parol evidence as to its true location, and the quantity contained therein. It is called in one part of the description " Lee's land," and said by estimation to contain 1200 acres, and the boundaries are given. All the land thus bounded and thus described, and owned at that time by Keim, Wetherill and Seitzinger, should you find for the plaintiff, you may give him the one-sixth part of."

The jury rendered the following verdict:

" We find in favour of the plaintiff, one-sixth part of the whole

[Seitzinger v. Ridgway.]

of the land, called ' Lee's land,' bounded by lands of Francis B. Nichols, Pott & Bannan, Kettle & Wagner, and others, situated on Mill Creek, Schuylkill county, and owned by G. D. B. Keim, on the 19th of December 1827."

Judgment was entered *quod partitio fiat,* to Ridgway one-sixth, and the other parties their proportions. On this an inquisition was had, setting out the different purparts, and stating that after consideration of the papers in evidence touching the matters in controversy and the identity of the lands and premises described in the writ, they found they were the same as those generally known as "Lee's land," or "the Lee lands;" and annexing a diagram for 1444 acres 34 perches in one body, laying down the several purparts or divisions, and dividing them into four parcels.

The defendants required the jury of inquest to exclude from the partition all lands except such as could be included in the three warrants of Henninger, Sillyman and Thiehl, and all lands the title to which was not in Keim on the 19th of December 1827. On the return of the inquisition, judgment was given that the partition remain firm and stable.

Errors assigned :

1. In admitting the deeds and letters objected to by the defendants, and referred to in the several bills of exception to the evidence.

2. In admitting the testimony of Lauderbrun.

3. In receiving the testimony of Bannan, an interested witness, and in refusing to withdraw his testimony from the consideration of the jury.

4. In refusing to instruct the jury that the agreement between Seitzinger and Ridgway, dated 16th of August 1827, and the agreement between Keim and Ridgway, dated 16th of December 1827, were to be taken together and formed but one agreement and contract.

5. In telling the jury that the words " agreeably to the understanding and agreement with Jacob W. Seitzinger," in the article of agreement between Keim and Ridgway, referred not to the interest to be conveyed by Keim to Ridgway, but to the time when such interest was to be conveyed.

6. In charging that the plaintiff had shown such an equitable title as would enable him to recover in an action of partition.

7. In charging that they thought it their duty to withdraw most of the parol evidence from the consideration of the jury, without pointing out the part that was withdrawn, thus leaving the jury to guess as to what was to be considered.

8. In the answer to the first point submitted by the defendants.

9. In the answer to the defendants' fourth and fifth points.

10. In instructing the jury that by virtue of the agreement made between Keim and Ridgway, the latter was put into constructive possession of the land.

11. In telling the jury that it was necessary to prove that the plaintiff had been actually ousted by defendants, or otherwise he was entitled to a verdict in his favour.

12. In charging that the jury might give the plaintiff the one-sixth part of the land thus bounded and described, and owned at that time by Seitzinger, Keim, and Ridgway; there being no evidence of any agreement to convey land between Ridgway and Seitzinger, or Ridgway and Wetherill.

13. The verdict is vague and indefinite, and does not point out to the inquest the land to be divided with sufficient certainty.

14. In ordering judgment to be entered, setting out the several purparts of defendants, the same purparts not having been found by the jury.

15. The inquest have included in the partition, land which the verdict excludes, and have excluded land which the verdict includes.

16. The verdict does not ascertain the purparts of the respective defendants.

17. The effect of the charge of the court was to withdraw the facts from the jury, and induce them to render a verdict for the plaintiff, though there was no proof that he had ever paid or tendered his proportion of the cost of the land, nor did the charge leave any such question for the decision of the jury.

18. The charge of the court authorized a verdict against the defendant Seitzinger, on the ground of an alleged alienation of his land without any writing signed by him, or an authorized agent on his behalf.

19. As regards Seitzinger, the charge of the court dispensed with proof of payment, or a tender by the plaintiff of the costs and interest upon one-third of the land, and compliance with the other conditions of the article of 16th of August 1827.

20. As regards Seitzinger, the charge of the court withdrew from the jury all inquiry whether the conditions of the said article of agreement of 16th of August 1827 had been complied with, or compliance therewith had been excused or dispensed with.

21. The court held Seitzinger bound by an alleged parol agreement, never ratified, sanctioned, or referred to in any writing under his hand.

22. There was no evidence against the heirs of Samuel Wetherill to sustain the charge, verdict, or judgment.

*Cadwallader* and *Greenough*, for the plaintiffs in error, contended that the agreement of 19th of December 1827 was substantially to the same effect as the prior agreement of 16th of August, and gave the plaintiff a right only to his share of the profits of the lands when sold, and not any right in the lands themselves; therefore an action of partition would not lie. By the agreement of August the plaintiff had Seitzinger's agreement for one-third of

[Seitzinger v. Ridgway.]

the nett proceeds of sale; by that of December, the plaintiff obtained no more than Keim's assent to the same thing in the same terms. The reference in the latter agreement is to the understanding and agreement made with Seitzinger in writing, and shows the meaning of the parties. Seitzinger never agreed to such a change of the previous bargain as is alleged, even if it were made. Every writing of his disclaims it, and the parol evidence is to the same effect. Indeed, his rights could not be bound except by writing. That being the case, how can any legal effect be given to it, according to the plaintiff's construction? It would make one bargain for one tenant in common, and another for the other. The intention of the parties is to be gathered from every part of the instrument; attending circumstances are to be considered, and the instrument reformed by the design the parties had in contemplation. 4 *Rawle* 435; 7 *Serg. & Rawle* 36; 8 *East* 89; 5 *Whart.* 64; 1 *Baldw.* 464.

The verdict and judgment include lands not within the agreement at all. The lands mentioned in the writ and recovered lie entirely south of those described in the last agreement as having been sold to Wetherill, which are the three tracts conveyed by Lee to Keim on the 15th of November 1827, joining lands of Nichols, Kettle & Wagner, Potts & Bannan, and others. These, if any, are the lands the plaintiff was entitled to a share of, and are those which were known by the name of Lee's lands. They had been long before contracted for by Keim, whereas the lands lying south were not conveyed till after the agreement of August, and most of them not till after the agreement of December 1827.

Bannan was an incompetent witness to sustain the plaintiff's recovery. He was a judgment creditor depending on the recovery for payment. He stands in the situation of a mortgagee. A person is incompetent wherever his interest may be secured by a recovery or a claim against him thrown on another, or he is wholly or partially relieved from a demand. 3 *Rawle* 133; 3 *Serg. & Rawle* 427; 1 *Watts* 270; 3 *Watts* 121; 9 *Pick.* 322; 5 *T. R.* 310, 174; 7 *Cow.* 360.

They further insisted on errors in the declaration, the verdict the inquisition and judgment thereon.

*Loeser* and *Scott, contra.* The tracts described as those known by the name Lee's lands were not the three warrants to Henninger, Sillyman and Thiehl, which are of little or no value. They are a body of lands, embracing several warrants obtained from Ebert, Shappel, and others, by Ridgway, through Bannan, at the instance of Keim and Seitzinger, and which they claimed and went into possession of under the Lee warrants. By that name we proved they were known, and were those contemplated by the parties. All the real title to them came from Bannan, and the

[Seitzinger v. Ridgway.]

consideration of the agreement was Bannan's conveying these titles, which he had previously obtained.

The agreement of December 1827 is independent of that of August. The understanding and agreement therein referred to is not Ridgway's agreement, but a parol understanding with Seitzinger; and if it were, yet the agreement of December was meant to change the terms of the previous one, and to substitute the land for the profits of sale. It is sufficiently distinct and explicit. The parties, land, adjoiners, when title was to be made, are all mentioned. Any variance of a former agreement will be presumed to have arisen from a change of intention. *Baldw.* 464. The words arranged and settled refer to the time when the title should be completed. Seitzinger's not signing is unimportant, as he had no legal title at all; that was in Keim, who was trustee for Seitzinger, Ridgway and himself. Seitzinger held by parol agreement through Bannan.

As to Bannan's competency, he had not a present certain interest in the event of the suit; it was merely contingent; and his being a judgment creditor did not disqualify him. 8 *Watts* 227; 2 *Stark. Ev.* 244; 9 *Watts* 268; 4 *Johns.* 230; 5 *Johns.* 158; 5 *Wheat.* 420; 4 *Wend.* 292, 356; 12 *Mass.* 20; 6 *Mass.* 497; 8 *Mass.* 426; 1 *T. R.* 163; 2 *Rawle* 279; 16 *Serg. & Rawle* 193.

The opinion of the Court was delivered by

KENNEDY, J.—Notwithstanding the assignment of twenty-two errors in this case, it is susceptible of being resolved into the following questions: First. Did the written agreement of the 16th of August 1827, between Jacob W. Seitzinger and Thomas S. Ridgway, and the written agreement of the 19th of December in the same year, between George D. B. Keim and Thomas S. Ridgway, vest such an interest in Thomas S. Ridgway, the plaintiff below, to the lands in question, or to any part thereof, as will enable him to maintain this action? Secondly. What lands formed the subject-matter of and are embraced within these agreements? Thirdly. Was John Bannan, Esq. a competent witness; and if he was, was the main part of his evidence competent? It is proper, however, to premise before answering these questions, as also to bear the same in mind throughout, that Jacob W. Seitzinger and George D. B. Keim were joint contractors for the original purchase of the Lee lands, that is, the lands surveyed under the warrants in the names respectively of George Henninger, Susannah Sillyman and Henry Thiehl, which are the only lands, as will be shown in the sequel, that are included in the agreement of the 19th December 1827, for their own use, to hold the same as tenants in common, though by an agreement between them the legal title thereto was to be conveyed by the seller to George D. B. Keim alone, who was to hold an undivided moiety thereof for his own use, and the remaining undivided moiety for the use of

Jacob W. Seitzinger. Now as to the agreement of Jacob W. Seitzinger with Thomas S. Ridgway of the 16th of August 1827, it is perfectly clear that no right whatever to the land, therein mentioned, is thereby vested in the latter; neither does it appear that it was so intended; on the contrary, it is thereby expressly declared " that Thomas S. Ridgway is to have one-third of the *nett proceeds* of the aforesaid lands, that is to say, *one-third of profits*, after deducting costs and interest upon the said one-third, *in consideration of his services in the sale of said lands.*" It is evident, from the terms of this agreement, that a sale of the lands was contemplated, in which Thomas S. Ridgway was to have an agency, and for his services in effecting sales he was to have a certain proportion of the nett proceeds or profits arising therefrom, and not any interest or right in the lands. Though the plaintiff below gave this agreement in evidence, I do not understand it to be relied on by his counsel as constituting him a tenant in common of the lands. But the agreement of the 19th of December 1827, with George D. B. Keim, is urged as being all-sufficient for that purpose. This agreement it is true, though in terms not a conveyance of any immediate interest in the lands, does contain an engagement on the part of George D. B. Keim seemingly " to convey to Thomas S. Ridgway, his heirs or assigns, the undivided third part of a moiety, being one-sixth part of the whole of a certain tract of land situate on the waters of Mill creek, in Schuylkill county, adjoining land of Francis B. Nichols, Esq., Kettle and Wagner, Potts and Bannan and others, containing by estimation 1200 acres; being the *same tracts* of land which are known by the name of *Lee's lands; to be conveyed to said Ridgway,* when the title to said land shall be arranged and settled, *agreeably to the understanding and agreement made with Jacob W. Seitzinger.*" The court below, however, in one part of their charge to the jury, appear to consider this agreement not merely of an executory character, and as only binding Keim to convey the one undivided sixth part of the lands to Ridgway at a future day, but as conveying to and vesting in him immediately a right and title to one-sixth of the lands, whereby if the lands were not then in the actual possession and occupation of Keim and Seitzinger, the constructive possession thereof became *eo instante* vested in Ridgway; for the court say " if the jury believe the land was wild and unoccupied, and not in the actual possession of Keim and Seitzinger, and not occupied by them when the agreement of the 19th of December 1827 was made with said Keim, it would put the plaintiff (Ridgway) in the constructive possession of the land mentioned in it;" meaning such possession of it as would enable him to maintain his action for a partition thereof, unless he had since been actually ousted of it. In this we think that the court erred; for according to the terms of the agreement it is manifest it was not

intended to have any such operation and effect as the court gave to it.

But the great error of the court was in their rejecting the agreement of the 16th of August 1827, made by Seitzinger with Ridgway, as being the agreement referred to in the agreement of the 19th of December following, made by Keim with Ridgway, and in not considering the former of these two agreements as a part of the latter; but considering the agreement made with Seitzinger and referred to, as an understanding, or one merely by which the title to the lands was to be arranged and settled, and that it was referred to only for the purpose of showing or ascertaining the time when Keim should convey one-sixth of the lands to Ridgway. Though the agreement referred to as made with Seitzinger is not mentioned as being in writing, which the court below seem to have considered a material circumstance, and to have laid some stress on, yet it is fair and right indeed, to presume that it was; otherwise, the subject-matter of it being land, it would be wholly inoperative and of no avail, in passing an interest or estate therein, under the Act of Assembly against frauds and perjuries. If the agreement with Seitzinger, referred to by Keim in his agreement, had been merely verbal, it might have rendered Keim's agreement inoperative under the Act against frauds, because not reduced into writing so as to give it effect according to the intention of the parties, without the introduction of parol evidence to show what it was, which could not have been admitted for such purpose. Every material part of an agreement for the purchase or sale of lands must be put in writing and signed by the party passing the right therein; no part can be supplied by parol evidence; otherwise no interest or estate will pass or be created, excepting in the case of leases for a term not exceeding three years. But here there was an agreement made with Seitzinger, relating to the same lands, on the 16th of August preceding the date of Keim's. In the absence of all evidence tending to show the existence of any other agreement with Seitzinger in writing, we must take it that the agreement of the 16th of August 1827 is the one referred to by Keim in his agreement of the 19th of December following. It is not unreasonable to suppose that Keim, at the time of making his agreement, was, at least, in doubt as to the import and tenor of Seitzinger's agreement, as it was not shown to him though in the possession of Ridgway, but not being willing to make any agreement with Ridgway that would not be in perfect accordance with Seitzinger's agreement, he therefore referred to the latter as one to which his own must, in every respect, be subject. In short, for the purpose of making Seitzinger's agreement the controlling one, and his own subservient to it. Thus binding himself only to observe and carry into effect Seitzinger's agreement, whatever it might be. It is obviously referred to as an agreement that would speak for itself, and therefore, most probably, must have been

understood to be in writing, and not one resting in parol merely, that depended for its establishment upon the proof of loose or casual conversations.    The very circumstance too of Keim's agreement being reduced into writing tends to show that the parties were unwilling to let any agreement between them relative to the same subject rest in parol without being reduced to writing.    It is most likely that Ridgway had become dissatisfied with his agreement made with Seitzinger, which gave him only a certain portion of the proceeds or profits, which should arise from sales of the lands, as they could be effected from time to time, and was desirous, instead thereof, to obtain a right to or interest in the lands themselves, and finding that Keim was willing to give him such right or interest, if consistent with the previous agreement which he had from Seitzinger relating to the same lands, concluded to take all that Keim was willing to give him, and take his chance for what he might be able to make out of it afterwards.    This inference seems naturally to arise from the fact that Ridgway was in the possession of Seitzinger's agreement at the time he obtained Keim's, but did not think it advisable to produce it and show it to him; indeed it is very probable that if he had, no agreement would have been signed by Keim, or at most, not one couched in the same terms.    The agreement therefore with Keim was, at most, only a covenant by him to convey to Ridgway one-sixth of the whole land, or one-third of that which remained unsold, according to the understanding and agreement made with Jacob W. Seitzinger, as soon as the title to it should be settled and arranged; which as it seems from some of the parol evidence, was thought to be affected, perhaps in part at least, by older warrants and surveys than those under which Lee held and sold it.    The agreement made with Seitzinger is obviously referred to for the purpose of determining the nature and extent of the interest that should be given or conveyed to Ridgway; that is, whether it should be a portion of the land itself, or of the money that should arise from the sale of it; and not as the court below supposed, to determine or fix the time merely when a conveyance of one-third of the land remaining unsold should be made by Keim to Ridgway.    To say that Keim should convey to Ridgway as soon as the title to the land should be settled and arranged agreeably to an understanding and agreement *made* with Seitzinger, when no agreement in relation to such matter was shown to exist, and in truth when from the very nature of the thing none could well even be imagined to exist, would be unmeaning and without force, because the only difficulty that was supposed to exist in regard to the title to the land, if it existed at all, was the older claims of third persons, and therefore could only be removed or settled by an understanding and agreement to be made, not with Seitzinger but with those third persons.    We therefore consider the agreement of Keim as a confirmation merely of the previous agreement made with Seit-

IV. — 62

zinger, and as giving Ridgway an interest in the proceeds of the lands after sales thereof shall be made, but not as giving or vesting in him any right to the lands themselves, so as to enable him to maintain either an action of partition or ejectment for them.

The second question renders it necessary to inquire and ascertain the specific lands intended to be made the subject-matter of the two contracts, and to which the engagements therein contained must be applied. The description of the lands, as contained in the agreement of the 16th of August 1827, with Seitzinger, is very vague and uncertain, referring to nothing by which their location could be rendered certain, unless it be that they are the same lands which George Keim and Jacob W. Seitzinger, of Reading, had purchased, lying on and about the Mine Hill, in Schuylkill county, containing about 1400 acres. But the second agreement with Keim contains a description, as to their identity and location, which would seem to remove all doubt on the subject. For after describing them as a tract of land, situate on the waters of Mill creek, Schuylkill county, adjoining land of Francis B. Nichols, Esq., Kettle and Wagner, Potts and Bannan, and others, containing by estimation 1200 acres, it declares them to be the same lands known by the name of Lee's lands; and in the conclusion further states, that one moiety thereof had been sold to Samuel Wetherill; for the one-third of the nett profits or proceeds whereof Keim binds himself to account to Ridgway, after deducting the purchase money paid for it and the expenses attending the same. Now it appears that Mordecai Lee had become the owner of three contiguous tracts of land at or in the neighbourhood of the above description, surveyed under three several warrants granted, one to George Henninger, second to Susannah Sillyman, and the third to Henry Thiehl, containing in all about 1200 acres and 85 perches. That Keim & Seitzinger had agreed with Lee for the purchase of these lands anterior to the 16th of August 1827, when Seitzinger made his agreement in relation to the profits to be made by a resale of the same, and that on the 15th of November immediately preceding the date of Keim's agreement with Ridgway, Lee and his wife conveyed these lands to Keim as being held under the warrants mentioned above and included within the surveys made in pursuance thereof. These facts being made to appear, no doubt could be entertained as to what lands were meant by the "Lee's lands," when it was not shown or pretended that Lee ever claimed any lands in that section of the country, other than the three tracts surveyed under the warrants in the names respectively of Henninger, Sillyman & Thiehl. It appeared also that the lands surveyed under these warrants were the only lands to which Seitzinger & Keim had any right and claim in that part of the country at the times of their respective agreements with Ridgway; so that their agreements cannot well be considered as applying to and embracing any other land. All the evidence, therefore, given,

going to show that other lands than those included within the surveys made in pursuance of the three warrants were said or reputed to be the Lee lands or claimed as such, was irrelevant, even supposing Ridgway to have had a right to a partition of the lands mentioned in the two agreements, and calculated to mislead the jury who tried the cause, and the inquest afterwards who aided the sheriff in making the partition, and consequently ought not to have been received.

The next question is, was Mr Bannan a competent witness for the plaintiff below? It seems that he is and was at the time a judgment creditor of the plaintiff to the amount of $2500 or $2600, beside interest thereon, and that, according to his testimony, the payment of his judgment depended mainly, if not entirely, upon the plaintiff's being able to establish his right to the land of which he claimed to have partition made in this action. The witness, therefore, being called, as such, to support the right of the plaintiff to the land, was called to give evidence in favour of his own interest, which was not inconsiderable. But this he could not do according to the rule of law on the subject; and was therefore incompetent on account of his interest in the event of the suit. We do not mean to say that in every case where the witness is a judgment creditor of the plaintiff in such action as the present, that of itself is sufficient to render him an incompetent witness for the plaintiff, because it may be, that the plaintiff has other real estate clear of all dispute, upon which the judgment is a lien, of a value greatly more than sufficient, under any circumstances, to make the payment of the judgment perfectly secure; in such case the interest of the creditor would not seem to be such as to exclude him from being a witness for the plaintiff; but in a case like the present, where, as the judgment creditor himself testifies, there is but "*a slim chance* of his getting the amount of his judgment, unless the plaintiff can establish his right to the lands in question," the interest of the creditor is so gross and palpable that it is impossible to say that he is otherwise than deeply interested in the event of the suit, and therefore incompetent to be a witness for the plaintiff. But this is not all, for a great deal of his testimony was likewise incompetent. In his narrative he is permitted to expound and explain the agreement of the 19th of December 1827, which he reduced to writing between Keim & Ridgway, which ought to have been done by the court and not by the witness. And again, further to show that, by mere verbal agreements between Keim, Seitzinger & Ridgway, Ridgway was to have not only an interest in the Lee lands, those actually purchased by Keim & Seitzinger, but likewise an interest in additional lands that should thereafter be purchased; and for the purpose of giving Ridgway, as may be fairly inferred, an interest in those other lands, after the purchase of them by Keim & Seitzinger, under the agreement in writing with Keim, if possible, to prove that they

were also called the *Lee lands*. Such evidence was inadmissible, in the first instance, because it varied and changed the written agreement of the parties; and, in the second instance, because it was an attempt to create and pass an interest in fee-simple in lands without writing, contrary to the Act against frauds and perjuries.

Judgment reversed, and a *venire de novo* awarded.